ORIGINAL 400001509

CLERK OF DISTRICT COURT
NORTHERN DISTRICT OF TX
FORT WORTH DIVISION
FILED

2023 JUN -1  PM 1:43

DEPUTY CLERK_____

[Jaime Reborn]
[Pro Se]
[209 Settlers Glen Trail, Arlington, TX 76002]
[817-793-9886]
[jaimereborn@yahoo.com]

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF TEXAS

[JAIME REBORN],

          Plaintiff,

vs.

[UNIVERSITY OF NORTH TEXAS],

          Defendant

Case No.:

4-23CV-548-0

**I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973**

## COMPLAINT AT LAW AND IN EQUITY

AND NOW, comes the Plaintiff, Jaime Reborn, by and through himself, *pro se*, to file the instant complaint and in support thereof avers as follow:

### I.  NATURE OF THE CASE

1. The Plaintiff, Jaime Reborn, hereby initiates the instant action against the Defendant, University of North Texas, due to violation of Section 504 of the Rehabilitation Act of 1973.

### II.  PARTIES

The parties in the petition are the Plaintiff, Jaime Reborn, and the Defendant, University of North Texas (UNT).  The Plaintiff in this petition may alternatively be referred to as Plaintiff, Jaime Reborn, or Mr. Reborn.  The Defendant in this petition may alternatively be referred to as Defendant, University of North Texas, or UNT.

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973  - 1

### III.  DISCOVERY LEVEL

The discovery level in this case, if needed, is level 2.

### IV.  JURISDICTION AND VENUE

The Plaintiff, Jaime Reborn, resides in Tarrant County, TX.  The Defendant, University of North Texas, operates its main campus, in Denton County, TX.  The United States District Courts for the Northern District of Texas has jurisdiction over the participants and issue(s) in dispute in this petition and is, thus, the proper venue for this petition.

### V.  STATEMENT OF FACTS

The Plaintiff, Jaime Reborn, a United States Infantry combat veteran, completed his Doctorate in Management of Information Systems Technology (DM/IST) from the University of Phoenix in June of 2013.  In 2014 the Plaintiff, Jaime Reborn, was diagnosed as having Chronic Migraine Syndrome (CMS) by the Department of Veterans Affairs (VA).  Wanting to continue to further his education, the Plaintiff, Jaime Reborn, begin reviewing some PHD programs in which he could use his military benefits.  Due to his disability, the Plaintiff, Jaime Reborn, a second PHD would be extraordinarily challenging and so the Plaintiff researched some PHD programs that would be most suitable to him based on his special needs.  The University of North Texas had some versions of their PHD programs which could be taken online and the university also special provision advertised within its catalog that significantly reduced the course load for it PHD programs for any students that already had a previous PHD/Doctorate. According to UNT's catalog, a previous PHD/Doctorate would be treated as a minor on the graduating student's diploma/degree.  After consulting with representatives from the University of North Texas, the Plaintiff, Jaime Reborn, decided to apply to the University of North Texas for its PHD program in Learning Technologies (LTEC) since he already had a previous

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973  - 2

Doctorate and the significantly reduced course load would make it easier for the Plaintiff to be successful in the program. The Plaintiff, Jaime Reborn, was accepted into the online PHD Learning Technologies program at the University of North Texas and began taking classes in June of 2015 with a scheduled graduating class of 2019 (2019 Cohort). However, once the Plaintiff, Jaime Reborn, began taking classes at the University of North Texas in its online PHD Learning Technologies program, the university did not honor its contract or agreement with the Plaintiff, Jaime Reborn, to allow him any reduction in his course load whatsoever. The Plaintiff, Jaime Reborn, asked, on multiple occasions, for a waiver and/or substitution of classes and was denied and told that there could be no modification to his course load. Not only did the University of North Texas refuse to officially honor the Plaintiff's Doctorate with regard to the significantly reduced course load that it offered in its catalog, the Plaintiff, Jaime Reborn, was given a substantial amount of additional course work which he was not able to complete until October of 2021, two years after the Plaintiff, Jaime Reborn, was to have graduated on a regular course load. To be clear, 2019 is when the Plaintiff, Jaime Reborn, would have been scheduled to graduate without a reduced course load. Had the University of North Texas honored its agreement with the Plaintiff, Jaime Reborn, and allowed him to use his previous Doctorate as a part of the online PHD Learning Technologies program, the Plaintiff would have been on schedule to graduate prior to 2019. In 2018, the Plaintiff, Jaime Reborn, was diagnosed with Major Depressive Disorder (MDD) by the Veteran's Administration and in 2022, the Plaintiff was diagnosed with Post-Traumatic Stress Disorder (PTSD). The Plaintiff, Jaime Reborn, believes that his medical condition worsened over the years, since 2014, in part, due to his mistreatment at the hands of the University of North Texas. This behavior by the Defendant,

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973  - 3

University of North Texas, was abject discrimination against the Plaintiff, Jaime Reborn, and in blatant violation Section 504 of the Rehabilitation Act of 1973.

## VI.  ACKNOWLEDGEMENTS OF RATIONAL SELF-INTEREST

It should not be a tremendous leap of the imagination for a reasonable person to deduce, understand, and believe that a military veteran wanting to further his educational needs and suffering from an officially diagnosed medical disability would try to find an academic institution with and educational course load and delivery system would work in the best interest of such a student.

The University of North Texas was aware that the Plaintiff, Jaime Reborn, was a disabled veteran as the Plaintiff discussed this with UNT officials before applying to the UNT online PHD Learning Technologies program.  The University of North Texas was aware that the Plaintiff, Jaime Reborn, was a military veteran as the Plaintiff was attending UNT using military benefits.  The University of North Texas was aware that the Plaintiff, Jaime Reborn, had a previous Doctorate/PHD from the University of Phoenix as the Plaintiff discussed this with UNT officials before applying to the UNT online PHD Learning Technologies program.

## VII. PLAINTIFF DENIED REASONABLE ACOMMODATIONS FOR DISABILITY

All the Plaintiff, Jaime Reborn, was originally asking for was that the Defendant, the University of North Texas, honor the guidelines in the UNT catalog which allowed a substantially reduced course load for students who had already achieved a previous PHD/Doctorate.  Since the Plaintiff, Jaime Reborn, had already achieved a previous PHD/Doctorate, if the University of North Texas had honored its agreed upon contract with the Plaintiff, then this petition would not have been made necessary.  The cause for this petition was

arrived at solely due to the discriminatory actions of the Defendant, the University of North Texas.

## VIII.  EGREGIOUS DOUBLE-STANDARDS IN BEHAVIOUR BY DEFENDANT

The Plaintiff, Jaime Reborn, was assigned a Major Professor/Mentor, by the Learning Technologies Department, named Dr. Scott Warren, to help guide the Plaintiff through the Dissertation process.  The Plaintiff, Jaime Reborn, was assigned an Associate Graduate Professor, by the Learning Technologies Department, named Dr. LeMoyne Dunn, to help guide the Plaintiff through the Learning Technologies PHD program.  Dr. Dunn once sent the Plaintiff, Jaime Reborn, an email request, with Dr. Warren copied on the email, to ask the Plaintiff if he had completed a Dissertation at his previous academic institution, the University of Phoenix, and asked if she could read the Plaintiff's Dissertation.  Dr. Warren and Dr. Dunn were both original and permanent members of the Plaintiff's, Jaime Reborn's Dissertation Committee.  Dr. Warren and Dr. Dunn were both well aware that the Plaintiff, Jaime Reborn, had already completed a previous Doctorate/PHD.

Additionally, Dr. Warren, himself, was, at the same time, enrolled at the University of North Texas, attempting to complete his second PHD, the second being a Doctor of Philosophy in Logistics, Operations and Supply Chain Management (PHD/LOSCM).  According to Dr. Warren's LinkedIn page/profile he attended the PHD/LOSCM for only two years, from 2016 to 2018.  It begs the question of how could full-time instructor at the University of North Texas complete a full PHD program in only two years.  The Plaintiff, Jaime Reborn, believes the evidence indicates, more likely than not, that Dr. Warren was, in fact, using the same academic adjustment for reduced course load that the University of North Texas officials, Dr. Warren included, had refused to allow the Plaintiff to use.

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973  - 5

This is extremely egregious, abusive, and discriminatory behavior by the University of North Texas and, in particular, Dr. Warren, especially considering that UNT assigned Dr. Warren as the Plaintiff's, Jaime Reborn's, Major Professor/Mentor.  Consider that the Plaintiff, Jaime Reborn, started his PHD program with the University of North Texas in 2015 and was not allowed to use the prior PHD/Doctorate academic adjustment for reduced course load and did not graduate the University of North Texas until December of 2021.  Dr. Warren started his PHD program with the University of North Texas, was likely allowed to use the prior PHD/Doctorate academic adjustment or reduced course load and graduated in December of 2018.

Also in December of 2018, one of the Plaintiff's, Jaime Reborn's, 2019 Cohorts, Elaine Reeder, graduated the UNT PHD Learning Technologies program.  Dr. Warren was also Elaine's Major Professor/Mentor.  Dr. Warren and Elaine, herself, revealed to the Plaintiff, Jaime Reborn, separately and different individual times, that special provisions were made to help Elaine graduate the LTEC program early because she needed her PHD for a specific promotion at her place of employment.  Elaine told me this on her own in general conversation.  Dr. Warren told, the Plaintiff, Jaime Reborn, this when he disapproved a part of my Dissertation and I reminded him that he had told me to use a similar model off of Elaine's Dissertation.  When the Plaintiff, Jaime Reborn, showed Dr. Warren proof of the Plaintiff having modeled the Plaintiff's Dissertation component in question off of Elaine's Dissertation, Dr. Warren preceded to tell the Plaintiff something matter-of-factly to the effect that Dr. Warren and the rest of Elaine's Dissertation Committee had allowed her to get by on very lax standards because they were trying to help Elaine her through her Dissertation process so that Elaine could get her LTEC PHD and meet a timeline for a promotion at her place of employment.

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973 - 6

In the summer of 2016, Dr. Lynne Cox, a UNT PHD LTEC instructor and the then-Director of Graduate Programs, mistakenly enrolled the Plaintiff, Jaime Reborn, into the wrong course.  At that time, Dr. Cox was in charge of registering and/or approving the courses that the UNT PHD LTEC students enrolled in so that the students would not enroll into incorrect courses.  Thus, the Plaintiff would not have been allowed to register himself into the wrong course.  The course that Dr. Cox enrolled the Plaintiff, Jaime Reborn, in was, actually, a Masters level course called 5510 Technology Based Learning Environments.  The Plaintiff, Jaime Reborn, realized that he was in the wrong class when he noticed that none of the Plaintiff's other 2019 Cohorts were in the class.  After the Plaintiff, Jaime Reborn, had informed Dr. Cox of her mistake, Dr. Cox claimed she would fix the error but she never did.  After the very first class of 5510, Dr. Cox became derelict in her duties and was absent from the course for the last week or the second to last week of the summer course.  The 5510 course was eight-week (8 weak) course.  During this time, Dr. Cox was almost completely unresponsive to requests for assistance and the students were left to fend for themselves in order to learn the material.  The Plaintiff tried numerous times to reach Dr. Cox directly via email and by telephone and was not able to reach her with any substantive communication.  The Plaintiff contacted UNT PHD LTEC officials and was still unable to establish gainful communication with Dr. Cox regarding 5510.  The Plaintiff, Jaime Reborn, has a number of emails corresponding with Dr. Dunn, the Plaintiff's AGF, discussing the issue as it unfolded.  In one email, Dr. Dunn revealed to the Plaintiff that Dr. Cox was having some "rather serious family issues" and that "In the meantime, put your best effort forward (don't wait for her) and submit stuff on time. Missing deadlines in a doctorate is generally considered unacceptable, regardless of the reason. Always submit something on time, because anything is better than a zero".  Dr. Dunn was essentially telling me to do the course

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973  - 7

work, on my own, in course that I was paying to be instructed in. The Plaintiff, Jaime Reborn, was placed in an incorrect course by an incompetent teacher, who didn't even teach the class. Each official at the University of North Texas that the Plaintiff, Jaime Reborn, has brought up the 5510 course debacle up to has ignored that this situation ever happened. The Plaintiff, Jaime Reborn, asserts that the Defendant, UNT, will not be able to produce any evidence that any UNT official as ever addressed this issue at all.

The incident of the Plaintiff, Jaime Reborn, being mistakenly assigned by Dr. Cox into the 5510 course plays into the discrimination of the Plaintiff by UNT officials. Somehow, without the Plaintiff, Jaime Reborn, requesting it, the 5510 course, a Master's level course, was allowed to take the place of an actual PHD LTEC level course that the Plaintiff should have been enrolled instead. The 5510 course was not requested to be taken by the Plaintiff, Jaime Reborn, nor was Plaintiff ever told that the 5510 course was supposed to be a part of his degree requirements. This is because the Plaintiff, Jaime Reborn, was mistakenly assigned to course 5510. The Plaintiff, Jaime Reborn, did not make any request for the 5510 course to a part of his degree requirements nor did the Plaintiff sign off any paperwork formally agreeing to have the 5510 course added to his degree requirements. The UNT PHD LTEC Department (Dr. Cox) made this mistake of assigning the Plaintiff, Jaime Reborn, on its own and approved it on its own. That said, at the end summer semester, the Plaintiff, Jaime Reborn, had not yet received a grade for the 5510 course and the fall 2016 semester had started and the Plaintiff had still not yet received a grade for the 5510 course so the Plaintiff contacted officials at UNT until Dr. Cathleen Norris the then outgoing acting Dean of the UNT LTEC Department, was given the phone when the Plaintiff tried to contact the incoming Dean, Dr. Kinshuk (a mononym). Dr. Cox was very close friends with Dr. Norris as well as Dr. Warren. I didn't quite realize it at the

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973  - 8

time but Dr. Cox, Dr. Norris, and Dr. Warren all took offense that I was holding Dr. Cox

accountable for her dereliction of duty regarding her not being available for the 5510 course.  Dr.

Norris told me that she had recently spoken with Dr. Cox and that Dr. Cox had completed the

grading for the 5510 course and that Dr. Cox would be submitting grades very soon.  I asked Dr.

Norris what my grade was and she, grudgingly, told me that I would receive an A for the 5510

course.

It was not the Plaintiff's intention to take the 5510 course.  It was not the Plaintiff's

desire to take the 5510 course.  The 5510 course was not the course that the Plaintiff had paid for

and/or wasn't the course the Plaintiff had intended to pay for.  The 5510 course was not the

course that the Plaintiff and the UNT PHD LTEC Department had agreed upon that the Plaintiff

would be taking.

It was after this incident with Dr. Cox and her mistakenly enrolling me into the 5510

course that I began noticing extreme disparate treatment by the UNT PHD LTEC Department.

In May of 2017, I wanted to take a class on grant writing, the 6270 course.  I requested

permission to take the course and I was also concerned about the reduced course load that I was

supposed to be given regarding my having a previous PHD/Doctorate.  It became clear, through

a combination of emails, phone calls, and face to face conversations, that the Plaintiff, Jaime

Reborn, would not be allowed an academic adjustment to the course load based on the UNT

catalog even though the Plaintiff already had a previous PHD/Doctorate.  Dr. Cox sent the

Plaintiff a letter and an email (that included the letter) that stated that the Plaintiff could take the

6270 course as an extra course but it could not be substituted for any other LTEC course in the

Plaintiff's degree requirements because the Plaintiff had already taken the 6240 course and only

one of them would be allowed so the 6270 course would not count as a part of the Plaintiff's

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973  - 9

degree requirements.  Dr. Cox stated in the letter that she had spoken to Dr. Warren and the UNT

PHD LTEC Department Chair (Dr. Norris) and the decision was made by or mostly influenced

by those two persons.  On this letter, Dr. Cox signed her signature and copied Dr. Norris, Dr.

Warren, and Dr. Dunn.  The Plaintiff, Jaime Reborn, found it absolutely incredulous that the

6270 course could not be substituted for use anywhere in the Plaintiff's degree requirements,

even though the Plaintiff was supposed to be on a reduced course load, but the 5510 course,

which was a Master's level course, could be randomly substituted for a Doctoral level course

without the Plaintiff requesting to do so or the Plaintiff's participation in any formal discussion

on the subject of having the 5510 course substitute for whatever Doctoral level class the Plaintiff

was supposed to have taken instead of the 5510 course.

Dr. Cox further stated in the letter that "As published in the LT Handbook (catalog),

distributed doctoral students follow a prescribed sequence of coursework".  The "distributed"

Doctoral students referred to the online students and the Plaintiff, Jaime Reborn, was, essentially,

being told that the academic adjustment for a reduced course load didn't apply to the online

Doctoral students the way it applied to non-distributed Doctoral students.  At least, that's one of

the excuses the Plaintiff was told.

Dr. Greg Jones, who was initially going to be Plaintiff Jaime Reborn's, Major

Professor/Mentor, was supposed to be assisting the Plaintiff with the academic adjustment for a

reduced course load.  Major Professors/Mentors are supposed to give approval of their Mentee's

course requirements.  Tragically, Dr. Jones died about month before Dr. Cox sent the May 2017

letter and email.

In the fall of 2017, the Plaintiff, Jaime Reborn, was taking a course, 6030 Emerging

Technologies, with Dr. Norris the instructor of the course.  At the end of the semester, the

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973  - 10

Plaintiff had turned in all of the required work, but the Plaintiff missed the deadline for the last few assignments by just a very few days and, thus, the work was late. The Plaintiff found out that he had missed the assignment submission deadline when the Plaintiff contacted Dr. Norris to ask her why his last few assignments weren't graded. The Plaintiff received a grade of "F" in the 6030 course. At the time the Plaintiff had contacted Dr. Norris, however, grades had not yet been submitted for the semester for the 6030 course. This was the Plaintiff's very last scheduled core class of the LTEC program and Dr. Norris didn't budge one bit on the deadline for the assignments being turned in. The Plaintiff found out later that Dr. Norris had given an incomplete grade to at least one student in the Plaintiff's same class (and same 2019 Cohort) to allow that student to complete the work at a later time, but she did not offer the Plaintiff that same option. The Plaintiff asked Dr. Norris if the Plaintiff could take the class again in the spring of 2018 and she then told the Plaintiff that the class would not be offered again until fall of 2018. The Plaintiff was also told that the Plaintiff could not take another class as a substitute. The Plaintiff wants to make a point here to the court that, again, substitution of classes was not allowed. The Plaintiff understands that Dr. Norris was within her right to not accept his late coursework. However, the Plaintiff feels that this was clearly Dr. Norris' way of getting revenge on the Plaintiff for what Dr. Norris viewed as the Plaintiff trying to expose Dr. Cox, Dr. Norris and Dr. Warren's good friend, the year before. Dr. Norris could have allowed the Plaintiff an "incomplete" grade for the course rather than an "F". That wasn't the end of it. When the Plaintiff retook Dr. Norris' class in the fall of 2018, Dr. Norris had not changed very much of the course deliverables. However, when the Plaintiff turned in the exact same work, the Plaintiff was getting different and much lower grades for the same assignments that Dr. Cox had given much higher marks for the year before. The Plaintiff feels that Dr. Norris was sending a clear

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973 - 11

message to the Plaintiff of retribution.  The Plaintiff brought it to Dr. Norris' attention that she

was giving the Plaintiff lower grades for the same assignments that she had given higher grades

for the previous year and she then stopped grading his assignments so low.  Had the Plaintiff not

had that experience with Dr. Cox in the summer of 2016 in which Dr. Norris felt the Plaintiff

was trying to report Dr. Cox, the Plaintiff does not think that Dr. Norris would have reacted so

harshly to the Plaintiff regarding his assignments being just a few days late after the 2017 fall

semester.  Over the span of his six years enrolled in the UNT LTEC program, the Plaintiff

observed were many students who were given all kinds of exceptions to help them complete their

assignments, such as the student who was given an incomplete in the same 6030 course that the

Plaintiff received and "F" in.  The Plaintiff feels that his being treated so rigidly by Dr. Norris

was simply payback for trying to hold Dr. Cox accountable for Dr. Cox's dereliction of duty in

the summer of 2016.

### IX.  PLAINTIFF WAS FORCIBILY EXTENDED IN THE LTEC PROGRAM

Dr.  Greg Jones was, initially, supposed to be a part of the Plaintiff's Dissertation

Committee.  Tragically, Dr. Jones passed away about a year or so before the Plaintiff was to

begin his Dissertation study.  To the Plaintiff's knowledge, the Plaintiff never formally chose a

Dissertation committee.  While the Plaintiff has brought this fact up, several times, to UNT

officials (not having picked his Dissertation Committee), the Plaintiff has never had anyone

explain to him how his initial Dissertation Committee was chosen.

The Plaintiff's initial Dissertation Committee was comprised of Dr. Scott Warren, Dr.

Lemoyne Dunn, and Dr. Demetria Ennis-Cole.  While, initially, the Plaintiff had no problem

with Dr. Warren being on his Dissertation Committee, the Plaintiff doesn't know why Dr. Dunn

or Dr. Ennis-Cole were ever on his Dissertation Committee as they had both directly stated to

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973 - 12

him, prior to joining his Dissertation Committee, that they were not in support of his initial Dissertation topic, which was using artificial intelligence to facilitate an extra-terrestrial learning environment.

At the annual LTEC residency in the fall of 2018 (in or around September of 2018), the Plaintiff attended a meeting with Dr. Warren, Dr. Dunn, and Dr. Ennis-Cole.  The Plaintiff had told them that the Plaintiff wanted to do his Dissertation on using artificial intelligence to facilitate an extra-terrestrial learning environment.  With Dr. Warren as the Committee Chair, they each agreed to the Dissertation topic.

However, when the Plaintiff defended his Dissertation Portfolio in the spring of 2019 (around February of 2019), the Plaintiff failed his Dissertation Portfolio Defense.  The Plaintiff was told by his Dissertation Committee that the Plaintiff's Dissertation Portfolio was not approved because the contents in his Dissertation did not match and/or support his Dissertation topic, or something to that effect.  At no point in the program did his Dissertation Committee or anyone else tell the Plaintiff that his Dissertation topic had to match the contents in his Dissertation Portfolio.  Any one of his Dissertation Committee Members could have done a review of his Dissertation Portfolio before the Plaintiff defended it to let the Plaintiff know that the Plaintiff needed to modify it before the Plaintiff presented it, but none of them did.

The Plaintiff was furious but tried to remain polite and professional under the circumstances.  According to UNT LTEC policy, you can only fail the Dissertation Portfolio Defense once.  Thus the Dissertation Committee had the Plaintiff over the proverbial "barrel".  The Plaintiff posited that if the Plaintiff protested too adamantly, it might cause his Dissertation Committee to fail his Dissertation Portfolio Defense a second time.

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973  - 13

The Plaintiff changed his Dissertation topic to using artificial intelligence to facilitate learning technologies in an academic environment.  The Plaintiff meticulously ensured that his Dissertation Portfolio matched and supported his Dissertation topic.  The Plaintiff wrote papers supporting his Dissertation topic, so the Plaintiff of which the Plaintiff had published.  The Plaintiff did scholarly presentations.  His scholarly presentations were done through competitive submissions, which is what the Plaintiff was told by his Dissertation Committee was required by the UNT LTEC Department.  It cost the Plaintiff thousands of dollars and several months to prepare his second Dissertation Portfolio.  The Plaintiff successfully passed his second defense of his Dissertation Portfolio in the summer of 2019 (July, the Plaintiff believes).

However, minutes after passing his Dissertation Portfolio Defense, Dr. Warren assigned the Plaintiff a new Dissertation topic, which was now his third Dissertation topic.  Dr. Warren also chose the new data collection method and data analysis method for the Plaintiff.  Dr. Warren wanted the Plaintiff to do his Dissertation topic on the usability testing of e-portfolio websites and to use the Think Aloud Protocol (TAP) as the data collection method and Failure Modes and Effects Analysis (FMEA) as the data analysis method.  The Plaintiff was not only taken aback, but the Plaintiff was also furious.  The Plaintiff had never even heard of usability testing (by that formal term), TAP, or FMEA.  Nothing in the Plaintiff's Dissertation Portfolio supported a Dissertation topic on usability testing or the use of TAP or FMEA.  This was in direct contradiction to what the Plaintiff's Dissertation Committee had told the Plaintiff as their reason for failing the Plaintiff on his first Dissertation Portfolio Defense.  Now, the Plaintiff couldn't use any of his previous research that he had collected for his Dissertation study as it did not match the new topic that was forced up him by Dr. Warren and the Plaintiff's Dissertation Committee.  The Plaintiff, in effect, had to start over yet again.  If the Plaintiff's Dissertation

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973 - 14

Portfolio did not have to match and/or support his Dissertation topic, then there was no reason for the Plaintiff's Dissertation Committee to fail the Plaintiff in his first Dissertation Portfolio Defense.  When Dr. Warren changed the Plaintiff's Dissertation topic and assigned the Plaintiff the data collection and data analysis methods, neither Dr. Dunn nor Dr. Ennis-Cole asked any questions about the suitability of the topic, what TAP or FMEA were, or that the topic did not match the Dissertation Portfolio that the Plaintiff had just defended.

Dr. Warren also wanted the Plaintiff to have six chapters to his Dissertation as opposed to the usual five Dissertation chapters.  This decision was also made right after the Plaintiff passed his Dissertation Portfolio.  While the Plaintiff understands that some Dissertations do require six chapters, the Plaintiff feels strongly that it was Dr. Warren's intent that the Plaintiff be extended in the LTEC program for as long as possible.  The Plaintiff knew of no other students in his 2019 Cohort or any in the entire UNT PHD LTEC program that had to complete six chapters for their Dissertation.

The Plaintiff was devastated that after so much time in the program that the Plaintiff wouldn't be allowed to do his Dissertation on the topic of his choice, but the Plaintiff tried to move ahead and tried to complete his Dissertation in the topic and by parameters that were assigned to him.  The Plaintiff spent approximately the next year and a half or so learning about TAP and FMEA.  Once the Plaintiff began to become more knowledgeable about the TAP and FMEA subject matter, the Plaintiff began getting increasingly conflicting information from Dr. Warren about what was required for TAP, FMEA, and the requirements for the Plaintiff to complete his Dissertation.  From one conversation to the next, Dr. Warren would change his expectations of what was required.  The Plaintiff read several Dissertations during that time that gave examples of the use of TAP and FMEA and tried to model his work on those examples.

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973  - 15

However, even when the Plaintiff modeled his work on the other peer-evaluated examples of TAP and FMEA, Dr. Warren would usually find some reason to reject the Plaintiff's interpretation of TAP and FMEA as it applied to the Plaintiff's Dissertation.

Dr. Warren wanted the Plaintiff to do his Dissertation topic on an ePortfolio website that the Plaintiff had designed as one of his Portfolio requirements. The ePortfolio that the Plaintiff designed was only a minor part of his Dissertation Portfolio as it was only one of the required scholarly works that the Plaintiff created for his Portfolio. The Plaintiff had no previously significant experience with ePortfolios and the ePortfolio in the Plaintiff's portfolio was not, in any way, designed to be the subject of his Dissertation Portfolio. However, as an abject example of Dr. Warren's blatantly inconsistent expectations, Dr. Warren sent the Plaintiff an email some time in 2020 (perhaps the Summer) stating something to the effect that it might be improper for the Plaintiff to use his own actual ePortfolio website as a part of his Dissertation study and that the Plaintiff may have to use another ePortfolio website for his Dissertation study instead. The Plaintiff responded to Dr. Warren that the Plaintiff was not going to change to a new ePortfolio website because it didn't make sense to do so as the Plaintiff would not have access to changing those other websites based on the feedback of the study participants. This email from Dr. Warrant was sent to the Plaintiff about a year after the Plaintiff had already successfully defended his Dissertation Portfolio. The Plaintiff further reminded Dr. Warren it was he (Dr. Warren) who had chosen the topic of the Dissertation and the instrument over the objections of the Plaintiff. Dr. Warren reluctantly agreed to allow the Plaintiff to continue to move forward in using the ePortfolio that Dr. Warren, himself, had chosen for the Plaintiff's Dissertation study.

The de facto bait and switch on the Plaintiff's Dissertation Portfolio and Dissertation topic, by Dr. Warren and endorsed by the Plaintiff's Dissertation Committee, amounted to the

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973 - 16

Plaintiff having to spend an additional two years in the UNT PHD LTEC program since the Plaintiff was not allowed to use any of his previously gathered research information in his Portfolio to complete his Dissertation as a student using one's Portfolio is a foundation for their Dissertation preparation is standard and expected academic protocol.

## X.  PLAINTIFF'S EXPECTATIONS ON ADJUSTED ACADEMIC COURSE LOAD

When the Plaintiff, Jaime Reborn, contacted UNT officials about the "Requirements for the Second Doctorate", the Plaintiff was assured that it was a fairly standard process for students with a previous PHD/Doctorate and the Plaintiff was stunned as the semesters passed to see the situation devolve into a situation in which the Plaintiff was objected to so much abuse as well as the failure of the Defendant, the University of North Texas, to simply honor its agreement with the Plaintiff.

The Defendant, UNT, states in its catalog under the "Requirement for the Second Doctorate" that:

**"Applicants who hold an earned doctorate from an institution with Texas Higher Education Coordinating Board (THECB) recognized accreditation or an equivalent credential from a foreign institution may be admitted to the Toulouse Graduate School to work toward a second doctorate, subject to the following provisions.**

**1.      The applicant must meet all requirements governing admission to the Toulouse Graduate School and to the degree program to be pursued.**

**2.      The applicant must meet all requirements of the program to be pursued as to acceptable test (GRE, GMAT, etc.) scores, admission examinations, auditions, portfolios of work, letters of reference, etc.**

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973  - 17

3.      **The applicant must complete a minimum of 36 semester hours of approved course work in residence at UNT in accordance with the specifications of an approved degree plan. In most cases, the applicant's major on the first doctorate will be counted as the minor on the second doctorate, thus the reduction in the minimum required hours to 36.**

**This minimum program will ordinarily include dissertation credit amounting to 12 hours. Provision of a minimum number of credits to be earned in no way restricts the major department from requiring additional deficiency work and/or additional work on the doctoral program itself."**

Since the "Requirements for a Second Doctorate" were clearly outlined in the catalog of the University of North Texas and the Plaintiff, Jaime Reborn, had a previous PHD/Doctorate, the Plaintiff had no idea that he would have so much antagonism from UNT officials in trying to use the "Requirements for Second Doctorate". Prior to applying to UNT, Plaintiff, Jaime Reborn, earned a previous Doctorate from the University of Phoenix (UOP), which is accredited by the Higher Learning Commission (HLC) and the THECB lists the HLC as one of its recognized accreditors.

The Plaintiff, Jaime Reborn, relying upon the information in the UNT catalog regarding having a previous Doctorate, applied to the Learning Technologies (LTEC) PHD program at University of North Texas with the intention of taking a reduced course load based on holding a previous Doctorate. The Plaintiff, Jaime Reborn, met all of the conditions called for in the UNT for a reduced course load due to having a previous Doctorate.

The Defendant, UNT, was well aware that the Plaintiff, Jaime Reborn, held a previous Doctorate from UOP, a properly accredited university, as the Plaintiff, Jaime Reborn, had used UOP on his application to be admitted into UNT. There were also conversations in person, over

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973 - 18

the phone, letters, and via official UNT email accounts, between the Plaintiff, Jaime Reborn, and the Defendant, UNT, that lay bare that UNT teaching faculty and other pertinent UNT officials were unambiguously aware that the Plaintiff, Jaime Reborn, had previously earned a Doctorate/PHD.

## XI.  PLAINTIFF'S MISTREATMENT DURING HIS DISSERTATION

During the Plaintiff's conversation with Dr. Kinshuk regarding his mistreatment in the UNT PHD LTEC program, the Plaintiff recalls Dr. Kinshuk asking the Plaintiff something to the effect of what Dissertation topic had the Plaintiff originally told the UNT LTEC Department that the Plaintiff wanted to do when the Plaintiff was in the application process.  The Plaintiff told Dr. Kinshuk that the Plaintiff had told the LTEC Department that he wanted to do his Dissertation using artificial intelligence to facilitate an extra-terrestrial learning environment.  Dr. Kinshuk told the Plaintiff that he would check the records to verify the Plaintiff's claim about his original Dissertation topic and that he would get back to the Plaintiff.  However, Dr. Kinshuk never got back to the Plaintiff on whether or not he had confirmed the Plaintiff's claim about what his original Dissertation topic was.

The Plaintiff paid just over or just under $1,000.00 for editing services on his Dissertation to an editor that Dr. Dunn had recommended.  Another student in his 2019 Cohort also used this editor and the Plaintiff was told by that student that there was the impression among other students that even though the editor's services weren't very good, if you do not use their recommended editor then your Dissertation was less likely to be approved.  The editor even asked the Plaintiff why the Plaintiff had six chapters in his Dissertation.  The Plaintiff told the editor that the Plaintiff was told to do six chapters for his Dissertation.  The editor told the Plaintiff that she had never seen a Dissertation with six chapters in it.  Keep in mind that this is

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973  - 19

the editor that Dr. Dunn referred the Plaintiff to and that the editor was also someone who used to work in the UNT LTEC Department.  When the Plaintiff sent the edited version of his Dissertation to Dr. Dunn, she (Dr. Dunn) then made several recommendations for improvements. Dr. Dunn then contacted an annoyed Dr. Warren.  Unbeknownst to Dr. Dunn, Dr. Warren had informed the Plaintiff not to talk with Dr. Dunn about the contents of the Plaintiff's Dissertation. Dr. Warren did not want the Plaintiff speaking to Dr. Dunn about the Plaintiff's Dissertation because the Dr. Warren did not want Dr. Dunn to be anything other than a nominal Dissertation Committee Member so that he would not be challenged on or have any pushback with regard to his decisions on my Dissertation whether or not those Dissertations were correct or not.  After Dr. Dunn contacted Dr. Warren about the Plaintiff's Dissertation version that was reviewed by the editor, Dr. Warren reminded the Plaintiff not to speak to Dr. Dunn again.  Dr. Dunn ignored the fact that many of the errors in the Plaintiff's Dissertation that she (Dr. Dunn) pointed out were errors that the editor should have caught.  If the editor does not know or understand the formatting expectations of the UNT LTEC Department, then why did Dr. Dunn recommend her? Dr. Warren even made a comment of something to the effect, that perhaps Dr. Dunn may have been getting a kickback from the editor.  Dr. Warren made this direct comment.  The Plaintiff's point is that this is a comment that Dr. Warren made about a woman that he (Dr. Warren), himself, brought aboard the Plaintiff's Dissertation Committee.

    The Plaintiff finally defended his Dissertation Proposal in Spring of 2021 (April, the Plaintiff believed).  Prior to his Dissertation Proposal Defense, Dr. Ennis-Cole dropped out of his Dissertation Committee citing her pending retirement later that year.  This change in the Plaintiff's Dissertation Committee was relayed to the Plaintiff by Dr. Warren.  The Plaintiff then asked Dr. Lin Lin (Lin is, both, first name and last name) if she would be on his Dissertation

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973  - 20

Committee, replacing Dr. Ennis-Cole.  Dr. Lin accepted and was on the Plaintiff's Dissertation Committee for his Dissertation Proposal, which the Plaintiff successfully completed.

The Plaintiff's Institutional Review Board (IRB) application was sent days after his Dissertation Proposal was successfully defended but it took several weeks of revisions before it was accepted.  The Plaintiff did not get IRB approval until the Summer of 2021 (June, the Plaintiff believes).

In the Summer of 2021, after receiving IRB approval, the Plaintiff wanted to immediately start his interviews for his Dissertation study.  Dr. Warren told the Plaintiff that he would be going out of town on vacation during the first part of the Summer course session and that the interviews could be started two weeks when he returned.  Dr. Warren, without any prior notice to the Plaintiff, had decided to take a vacation even though the Plaintiff was already enrolled in a Summer class with Dr. Warren at the time and was not aware that Dr. Warren would not be fully available for the class.  The Plaintiff was extremely angry at the Dr. Warren's deception and contacted officials at UNT to express to them his dissatisfaction with the situation and how it was preventing the Plaintiff from completing his Dissertation.  The Plaintiff only received tepid responses from UNT officials that ultimately served to justify Dr. Warren's dereliction of duty.  Dr. Warren wanted the Plaintiff to videotape his interviews with the study participants using the TAP, so it made no sense for him to force the Plaintiff to wait for him to return from vacation to conduct his interviews since the interviews were supposed to be videotaped.  Here the topic of disability came up again as Dr. Warren was adamant that one of his handpicked students, who also had a disability, be a part of the study, specifically, because she had disability and, thus, needed to be included as a part of the study to collect data (the student's feedback) on how a

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973  - 21

person with disabilities would use the ePortfolio that the Plaintiff was testing in the Dissertation study.

Prior to this, Dr. Warren and the Plaintiff had several conversations about disabilities as they relate to veterans. Dr. Warren told the Plaintiff, Jaime Reborn, that his (Dr. Warren's) father had either been in the military or had worked for the military in a highly sensitive capacity and that his father had faced several challenges in dealing with the military. The Plaintiff, Jaime Reborn, explained to Dr. Warren that the Plaintiff, himself, was one of the soldiers who had been experimented upon in Operation "Desert Storm" with preventive chemical warfare drugs that had not been approved by the FDA. This issue of the United States government testing drugs on soldiers during the Gulf War was not a secret and Dr. Warren stated that he was familiar with story and that, based on what he had learned from his father's military experiences, was a surprise to him at all what the Plaintiff had told him about being experimented upon. I believe Dr. Warren said that his father was a military lawyer, but the Plaintiff can't recall for certain what capacity Dr. Warren stated his father had been involved with the United States military. That said, such conversations between the Plaintiff Jaime Reborn and Dr. Warren were not uncommon.

The need for TAP interviews for his Dissertation was wholly unnecessary and a waste of time. The Plaintiff could have simply submitted questionnaires or surveys to the study participants. The TAP interviews were about at least 90 minutes to 120 minutes each, and a few were a bit longer. It took about two weeks to schedule an available time that worked for the Plaintiff, Dr. Warren, and the eventual 9 participants that were in the study. Again, this only served to prolong the amount of time that the Plaintiff was in the UNT LTEC program.

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973 - 22

The Plaintiff knows of no one else in his 2019 Cohort that that was micromanaged to this degree in the conducting their Dissertation survey. Dr. Warren also wanted the TAP interviews transcribed. The Plaintiff didn't feel that there was any reason to transcribe the interviews if they were being recorded on video. Dr. Warren directed the Plaintiff to review and correct the transcripts (which were done by the software) anyway. The Plaintiff spent hundreds of dollars having the transcripts reviewed and Dr. Warren never checked the corrected transcripts and never even brought the topic up again. The Plaintiff contacted the Professor who actually created TAP and that Professor told the Plaintiff that he doesn't even transcribe recorded interviews in that situation.

After the Plaintiff was forced to waste the 2021 Summer session, the Plaintiff finally defended his Dissertation on October 4th, 2021. A few weeks before his Dissertation defense, Dr. Warren told the Plaintiff that Dr. Lin had decided to remove herself from his Dissertation Committee, for reasons the Plaintiff was never made fully aware of. Dr. Warren told the Plaintiff that Dr. Yunjo An, the LTEC Department Chair, had agreed to join his Dissertation Committee if the Plaintiff agreed to it. The Plaintiff agreed to Dr. An joining his Dissertation Committee, although the Plaintiff knew nothing about Dr. An's background. At this point, the Plaintiff just wanted to get his Dissertation completed. As the Plaintiff was finalizing his Dissertation and getting all of his Committee Members to agree to allow him to defend his Dissertation, Dr. An, by far, had the most problems with the Plaintiff's Dissertation while Dr. Dunn seemed to agree with whatever Dr. Warren said. Dr. An, at one point, asked the Plaintiff why his Dissertation had two methodology chapters. The Plaintiff is not sure what conversations that Dr. Warren had with Dr. An leading up to her accepting a place on the Plaintiff's Dissertation Committee, but the Plaintiff informed Dr. An that he had two methodology chapters

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973  - 23

in his Dissertation because Dr. Warren expressly told the Plaintiff that the Plaintiff had to have two methodology chapters in his Dissertation.  These types of things exacerbated the Plaintiff's anger with the process because Dr. Warren often had the Plaintiff defending content in the Dissertation that was simply there only at the directive of Dr. Warren even though the use, format, and necessity of such content and directives were not understandable to anyone but Dr. Warren.  The Plaintiff was left wondering why Dr. An would ask the Plaintiff why the Plaintiff had two methodology chapters.  The Plaintiff would think that she would know why the Plaintiff had two methodology chapters.  Dr. An was the Department Chair of the UNT LTEC Department.  The Plaintiff posited that, surely, she must have seen such a Dissertation format before.  The Plaintiff also believes that this was yet another example of Dr. Warren assigning the Plaintiff tasks to complete the Plaintiff's Dissertation that no one else in the program was familiar with or had been expected to do for their Dissertation.

In the Summer of 2021, Dr. Warren took it upon himself to calculate the scoring of the data that the Plaintiff had collected from the study participants.  The Plaintiff had not asked Dr. Warren to calculate anything.  After Dr. Warren had put the Plaintiff through all of that unnecessary work for his Dissertation, Dr. Warren grossly miscalculated each of the FMEA ratings and never caught his mistake.  Not only did Dr. Warren not catch his miscalculations on the FMEA rankings, neither Dr. Dunn nor Dr. An caught the miscalculations on the FMEA rankings either.  The reason why this is significant is because the entire study revolves around creating FMEA rankings and making recommendations for the study based on those rankings.

The Plaintiff feels that the simple truth is that Dr. Warren was nowhere near as familiar with FMEA as he claimed to be.  At Dr. Warren's instruction, he and the Plaintiff gave the rankings that were used in the calculations.  The Plaintiff wants the court to be clear that the

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973  - 24

Plaintiff actually defended his Dissertation with the incorrect calculations that Dr. Warren had given to him and neither Dr. Warren, Dr. Dunn, or Dr. An realized that the calculations were incorrect.  Previously, at one point in the lead up to the Plaintiff's Dissertation study in one of what became their many arguments about the process, Dr. Warren explicitly and vehemently told the Plaintiff that not only would the Plaintiff not be giving FMEA rankings for the study, Dr. Warren also said that the Plaintiff should not be giving rankings for the study.  Dr. Warren told the Plaintiff that he (Dr. Warren) and his (the Plaintiff's) fellow student Matthew Bonhamgregory, who also worked in the UNT LTEC Department, would be giving the rankings. When it came time for the submission of the FMEA rankings, Matthew's participation was not included for reasons that were never given.

The Plaintiff viewed his Dissertation Defense video that was posted by UNT and it is clear that the calculations that Dr. Warren submitted for the Dissertation were entirely incorrect. It's also clear that neither Dr. Dunn nor Dr. An caught the miscalculations either.  The Plaintiff, initially, never questioned the calculations because Dr. Warren's inflexibility left no room for him to consider the possibility that he could be wrong about anything.  Dr. Warren had pointed out during the Plaintiff's Dissertation Defense that the Plaintiff's brief written explanation at the top of the calculations was incorrect.  The Plaintiff's description was, in fact, correct and it was Dr. Warren's calculations that were incorrect.  As it turns out, it was Dr. Warren's erroneous comment that led the Plaintiff to see that Dr. Warren's calculations were incorrect.  Ultimately, the Plaintiff corrected the calculations and the Plaintiff put the corrections in the Dissertation and turned them in with his final edits, formally, a few weeks later via the final UNT submission process.  That said, Plaintiff also had to rewrite the entire Chapter 6 (the conclusion chapter), again, based on those calculations.  Dr. Warren is/was supposed to be knowledgeable with

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973 - 25

FMEA but the Plaintiff was forced to give his Dissertation Defense on conclusions that were derived from incorrect calculations that Dr. Warren forced on the Plaintiff. The entire Dissertation process was a complete waste of time.

In the Plaintiff's first conversation with Dr. Kinshuk, the Plaintiff was told by Dr. Kinshuk that he (Dr. Kinshuk) could not address the Plaintiff's concerns/complaints with Dr. Warren over TAP and FMEA because he (Dr. Kinshuk) was not knowledgeable on those subjects. So, the Plaintiff had to simply stand by as Dr. Warren forced the Plaintiff to use TAP and FMEA incorrectly for his Dissertation and not even the Dean of the UNT LTEC Department would assist the Plaintiff. The Plaintiff feels that the entire process was never about academics, but rather a power play for financial exploitation.

Dr. Warren also forced the Plaintiff to use Qualtrics, which was an online tool to collect information on potential study participants. This was not a UNT LTEC standard, just Dr. Warren's standard. The Plaintiff had never heard of Qualtrics and had never used it before 2021, for his Dissertation study. This was yet another unnecessary situation that caused the Plaintiff delays in his Dissertation process because the Plaintiff had to learn how to use Qualtrics. The Plaintiff had to learn to build a questionnaire in Qualtrics rather than simply using a more readily available tool, like Survey Monkey, as many of the other Doctoral students had done without even having to clear their choice with their Dissertation Committee.

Dr. Warren picked out the Plaintiff's Dissertation topic, the data collection method, the data analysis method, the names of the chapters of the Plaintiff's Dissertation, and the tool to do the Plaintiff's participant selection. The Plaintiff does not even feel that it is actually his Dissertation. The Plaintiff cannot even be proud of his PHD; The Plaintiff feels exploited and is extremely upset about his experience.

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973  - 26

The Plaintiff had been told by Dr. Warren, sometime during the Plaintiff's Dissertation classes that his Chapter 6, the final Chapter in the Dissertation study, would be about how to improve his ePortfolio website based on what the study participants said in the study.  However, after the Plaintiff had already written his Chapter 6, which had been tacitly approved by Dr. Warren, the Plaintiff was then told by Dr. Warren that the Plaintiff needed to change the content in Chapter 6 to discuss how the Plaintiff felt that usability testing may help various industries in corporate America.  The Plaintiff told Dr. Warren that the Plaintiff would change his Chapter 6/Conclusions Chapter only under protest.  To write about how the Plaintiff felt that usability may benefit various industries in corporate America was not only unscientific but there was absolutely nothing in the Plaintiff's study that supported how usability testing would benefit various other industries outside of academics.  If the Plaintiff were going to simply give his opinion on how usability testing could improve technology in other industries, the Plaintiff didn't need to spend six years going through the UNT LTEC program just to give his opinion.  The Plaintiff's Dissertation was about usability testing of ePortfolios in an academic environment. The Plaintiff's literature review was over ePortfolios and testing of ePortfolios, not usability testing in general.  The participants in the Plaintiff's Dissertation study gave feedback on usability testing of a specific ePortfolio, not usability testing in general.  The Plaintiff's Conclusions Chapter/Chapter 6, as originally directed by Dr. Warren, was supposed to be primarily about recommendations from the Dissertation study participants to employ usability testing to improve ePortfolios in academia.  The Conclusions Chapter/Chapter 6 was supposed to be an example to other educational facilities on how to improve their ePortfolios.

During the Dissertation study/testing phase, the Plaintiff had interviewed some study participants who were not in the UNT LTEC program.  Dr. Warren had pointed out that the

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973  - 27

Plaintiff had failed to notice that the language that was written regarding his IRB application was that all of the participants had to be in the UNT LTEC program.  Those participants were scrubbed from the study and their comments weren't used.  If all of the participants had to be in the UNT LTEC program, and weren't allowed to come from other industries, then it makes no sense why the Plaintiff's Conclusions Chapter/Chapter 6 would be about how usability testing would help out other industries rather than how usability testing would help academic institutions.

## COUNT I

## VIOLATION OF THE  SECTION 504 OF THE REHABILITTION ACT OF 1973

College students with disabilities, including veterans, are protected from discrimination by Section 504.  Section 504 prohibits discrimination based on disability by colleges that receive any federal funds, which is virtually every college in the United States.  Section 504 requires covered colleges to provide appropriate academic adjustments, such as modifications, to all qualified students, including veterans, with disabilities.

Section 504 requires colleges to provide academic adjustments (i.e., reasonable modifications or auxiliary aids and services) that are necessary to ensure student veterans with disabilities are afforded an equal opportunity to achieve academic success.  Examples of possible academic adjustments include, but are not limited to, reduced course loads, extra time on examinations and assignments, accessible electronic and information technology, note takers, sign language interpreters, modified desks for wheelchairs, separate and distraction-free spaces for tests and exams, and modified "no pets" policies to allow for service animals on campus.

Section 504 provides examples, but not a comprehensive list, of major life activities. Among those who may have disabilities are any student: who is substantially limited in the

ability to walk, speak, see, hear, concentrate, learn, breathe, or perform other tasks related to caring for oneself or working, has been burned or otherwise injured, or has diabetes, cancer, depression, anxiety, post-traumatic stress, a traumatic brain injury, etc.

The Defendant, University of North Texas, was already in a very strong position to comply with Section 504 of the Rehabilitation Act of 1973. The Defendant had in its catalog a "Requirements for a Second Doctorate" which, in and of itself, provided a very significant academic adjustment for reduced course load which, initially, was all the Plaintiff, Jaime Reborn, had been asking for. The Defendant, UNT, despite several opportunities to cure this deficiency and assist the Plaintiff, Jaime Reborn, abrasively violated the rights of the Plaintiff by knowing that the Plaintiff was disabled and not making any accommodations to assist the Plaintiff with completing the UNT PHD LTEC program such as allowing the Plaintiff an academic adjustment for reduced course load that the Plaintiff was qualified for even without having a previous PHD/Doctorate. The Plaintiff feels that this behavior by the Defendant, UNT, may have been spurred by the Plaintiff attempting to hold Dr. Lynn Cox accountable for her abdicating her responsibilities and abandoning the 5510 course that she had erroneously enrolled the Plaintiff in as Dr. Scott Warren and Dr. Cathleen Norris were both close friends (or close colleague's) of Dr. Cox. The Defendant's, UNT's, exceptionally malicious behavior is evidenced by the fact that Dr. Warren, who started his second PHD/Doctorate at the University of North Texas, was actually using the "Requirement for a Second Doctorate" himself and benefiting from an academic adjustment for reduced course load but did nothing to ensure that I could use the same process for my second PHD/Doctorate. Dr. Warren started his second PHD program at UNT a year after the Plaintiff, Jaime Reborn, started his PHD program but Dr. Warren, even with the responsibilities of a full-time Instructor at UNT, was able to finish his second PHD program in

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973  - 29

only two years while it took the Plaintiff, Jaime Reborn, six years to finish his second PHD.  It doesn't get much more blatant than that considering that Dr. Warren was assigned by the UNT PHD LTEC Department to be my Major Professor/Mentor and he was fully aware that the Plaintiff, Jaime Reborn, had a previous PHD/Doctorate and that the Plaintiff was disabled and could have and should have also benefited from an academic adjustment for reduced course load.

## PUNITIVE DAMAGES

As a consequence of the foregoing clear and convincing facts and the willful and malicious nature of the wrongs committed against the Plaintiff, Jaime Reborn, by the Defendant, University of North Texas, the Plaintiff is entitled to punitive damages.  The Plaintiff is entitled to exemplary damages under federal  law in excess of the minimum jurisdictional limits of this court.

## JURY DEMAND

The Plaintiff demands that this Court empanel a lawful jury to hear this case.

## RESERVATION OF RIGHTS

The Plaintiff specifically reserves the right to bring additional causes of action against Defendants and to amend this pleading as necessary.

All conditions precedent have been performed or have occurred.  The damages and remedies sought are within the court's jurisdiction.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff asks the Court to award the Plaintiff the following:

a.       All contractual payments returned to the Plaintiff

b.       As a direct and proximate cause of the Defendant's breach, the Plaintiff suffered losses in an amount not less than $100,000.00 in damages as a result of excess

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973  - 30

1  tuition and expenses in addition to other ancillary costs

2          c.      The Plaintiff is seeking compensatory and punitive damages for each of

3  the causes of action described herein in an amount to be determined in a trial by jury as

4  well as any and all other relief deemed necessary and applicable

5          d.      Pre-judgment and post-judgment interest at the highest rate allowed by

6  law

7          e.      Actual and consequential damages

8          f.      Reasonable and necessary attorney's fees and or any fees related to the

9  preparation of the related court case and court proceedings

10         g.      Costs of Court

11

12         Such other relief as to which the Plaintiff may be justly entitled.

13 Dated this [June _____1st_____, 2023].

14

15                              _____

16                              [JAIME REBORN
                                PRO SE]

I. VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973  - 31